JOHN L. LYON AND ANNA GRACE LYON

*vs.*

WILLIAM S. TOWNSEND AND SAMUEL C. TOWN-
SEND, EXECUTORS NAMED IN THE ALLEGED LAST
WILL OF LUCY B. TOWNSEND.

*Evidence: admissibility and weight; province of Court and
jury; Court of Appeals. Testamentary capacity;
trial of issues; evidence.*

In determining whether evidence, offered in a case, was such
as should have been submitted to the jury, the Court of Ap-
peals passes only upon the legal sufficiency of the evidence; the
weight of the evidence is for the jury.                     pp. 174, 187

In determining testamentary capacity, the question is whether
at the *time* of executing or acknowledging the will the testator
was capable of executing a valid deed or contract.          p. 175

The state of such capacity is to be determined by the condi-
tion of the testator's mind at the time of executing and acknowl-
edging the instrument.                                       p. 175

Incapacity before, or subsequent to, the time of making the
will does not necessarily imply that the testator was incompe-
tent when the will was made.                                p. 175

For the purpose of shedding light upon the state of the testa-
tor's mind at the time the will was made, evidence of his con-
dition, and of his bodily imbecility, both before and after that
period may be produced.                                     p. 175 .

The jury may, upon the whole evidence, infer incompetency at the time of executing and acknowledging a will or testament, according to the character of the entire capacity proved; which may be established by proof of the conversations, or actions, or declarations of the testator inconsistent with sanity, or of all of them together.　　　　　　　　　　　　　　　p. 175

The general maxim is, *semel furibundus, semper furibundus praesumitur.*　　　　　　　　　　　　　　p. 175

In determining a testator's capacity, provisions of the will, although not sufficient of themselves to avoid the instrument, may still be taken into account, with all the other circumstances.
　　　　　　　　　　　　　　　　　　　　p. 175

Sanity and mental capacity are presumed by the law to exist with reference to making wills, as well as to other transactions, and the burden of proof is upon those who allege their non-existence.　　　　　　　　　　　　　　　　p. 176

On an appeal from the rulings of the Court during the trial before a jury of the question of the testamentary capacity, it is not the province of the Court of Appeals itself to determine the question; its duty is but to determine whether the jury might reasonably have concluded from the evidence of the plaintiff that the testator was mentally competent or not.　　　p. 176

The presumption of knowledge of the contents of a will, which arises from its due execution and the reading of the instrument by a competent testator, is not overcome by the mere fact that this presumption may be rebutted.　　　　　　pp. 187, 191

On issues sent to a court of law to try the mental capacity of a testator, prayers are erroneous which leave to the jury to determine whether the testator knew the legal effect and operation of the particular words used.　　　　　　pp. 187, 188

On the trial of issues as to the capacity of a testator, prayers are erroneous which leave to the jury no guide in determining from the facts and circumstances of the case, whether or not the testator had sufficient capacity to make the will.　pp. 189-190

From the mechanical reading of a will by a person in the possession of testamentary capacity, the law presumes knowl-

edge of its contents. This presumption is in most cases conclusive; but, in exceptional instances, such a presumption is a disputable one. pp. 191-192

At the time of the execution of a will, the testatrix was in the anæsthesia room of a hospital, being prepared for the operation which terminated fatally; she had already had certain drugs and anodynes administered to her when the will was given to her to read and sign; there was evidence that, during the reading of the will, the testatrix, when she reached the residuary clause, temporarily lost consciousness under the effects of the drugs which were beginning to act upon her; and it was admitted that the residuary clause did not express either the instructions of the testatrix or her intention; it was *held,* that, under the circumstances, there was sufficient evidence to rebut the presumption as to knowledge as to the contents of the will which arose from the mechanical reading of the same by the testatrix; and it was further *held,* that, according to the undisputed evidence, the testatrix did not know and understand the contents of the residuary clause. p. 192

*Decided June 25th, 1914.*

Appeal from the Superior Court of Baltimore City. (BOND, J.)

The facts are stated in the opinion of the Court.

The following are the prayers of the plaintiffs and of the defendants, and the action of the Court upon the same:

*Plaintiffs' 1st Prayer.*—If the jury find from the evidence that at the time of executing the paper-writing mentioned in this case and purporting to be the last will and testament of Lucy B. Townsend and dated the twenty-sixth day of February, 1912, the said Lucy B. Townsend was not of sound and disposing mind and capable of making a valid deed or contract, then she was not in possession of that description of mental capacity which is required by law, and their verdict

should be in favor of the caveators on the second issue and
their anwer thereto should be "No." And the jury are in-
structed that the meaning of the words "sound and dispos-
ing mind and capable of making a valid deed or contract" in
respect to the disposition of property by last will and testa-
ment, is, that the party making such will must at the time
of making the same have fully understood the nature of the
business in which she was engaged, and must have had suffi-
cient capacity at said time to know and recollect her prop-
erty and to make a disposition thereof with judgment and
understanding with reference to the amount and situation of
the property, and to recollect the relative claims of the differ-
ent persons who were or should have been the objects of her
bounty, and also sufficient capacity to understand the manner
in which she in fact did dispose of her property. And the
jury are further instructed that it is not necessary for them
to find that Lucy B. Townsend was insane in the popular
sense of the word before they can adjudge her incapable of
making a valid deed or contract. (*Refused.*)

*Plaintiffs' 2nd Prayer.*—The plaintiffs pray the Court to
instruct the jury, that if the jury shall find from the evidence
in this case that at the time of the execution of the paper-
writing offered in evidence in this case, and purporting to be
the last will and testament of Lucy B. Townsend, the said
Lucy B. Townsend was not of sound and disposing mind and
capable of making a valid deed or contract, then the verdict
of the jury must be for the plaintiffs on the second issue, and
their answer thereto must be "No," although the jury shall
further find that said mental unsoundness was brought on by
bodily ill health or disease, or from the effects of medicine
administered to her. (*Granted.*)

*Plaintiffs' 3rd Prayer.*—The Court instructs the jury that
she who is not capable to execute a valid deed or contract is,
under the testamentary system of this State, incompetent to
make a valid will or testament. It is not sufficient of itself
that a testatrix should be able to describe her feelings or give

correct answers to ordinary questions; her feelings at the moment may dictate her description of them and the question may prompt the answers, and yet she may be inadequate to the transaction of other business, and unable to dispose of her estate with understanding and discretion.  (*Refused.*)

*Plaintiffs' 4th Prayer.*—If the jury find for the plaintiffs on the second issue, then, they must find for the plaintiffs on the fourth issue, and their anwer thereto must be "No." (*Granted.*)

*Plaintiffs' 5th Prayer.*—If the jury find for the plaintiffs on the second issue, then, their answer to the fifth issue must be "All parts."  (*Granted.*)

*Plaintiffs' 6th Prayer.*—If the jury find that before the paper-writing, offered in evidence and purporting to be the last will and testament of Lucy B. Townsend, and dated the twenty-sixth day of February, 1912, was executed by the said Lucy B. Townsend, she read said paper-writing; and if they further find that at the time of the execution of said paper-writing, she was capable of understanding the business in which she was engaged and of executing a valid deed or contract, then, the legal presumption is that she knew and understood the contents of said paper-writing; but the jury are further instructed that this presumption is not conclusive, but may be rebutted; and the defendants are bound under the fourth issue to satisfy the jury that Lucy B. Townsend understood the contents of said paper-writing; and unless the jury are so satisfied, the verdict must be for the plaintiffs on the fourth issue, and their answer thereto must be "No."  (*Refused.*)

*Plaintiffs' 7th Prayer.*—The Court instructs the jury that it was necessary for Lucy B. Townsend to know and understand the actual contents of the fourteenth item or residuary clause of the paper-writing offered in evidence, and purporting to be the last will and testament of Lucy B. Townsend, dated the twenty-sixth day of February, 1912; and if they find that before the said paper-writing was executed by her,

she read said paper-writing, including the said fourteenth item or clause; and if they further find that at the time of executing said paper-writing, she was capable of understanding the business in which she was engaged and of executing a valid deed or contract, then the legal presumption is that she knew and understood the contents of said paper-writing, including said clause or item; but the jury are further instructed that this presumption is not conclusive, but may be rebutted; and the defendants are bound to satisfy the jury that Lucy B. Townsend understood the contents of said item or clause; and unless the jury are so satisfied that she did understand the contents of said fourteenth item or clause, their answer to the fifth issue should be "Fourteenth Item," even though they may find for the defendants on the second issue, and even though they may further find that Lucy B. Townsend knew and understood the remaining contents of said paper-writing. (*Refused.*)

*Plaintiffs' 8th Prayer.*—The Court instructs the jury that it was necessary for Lucy B. Townsend to know and understand the actual contents of the fourteenth item or residuary clause of the paper-writing offered in evidence and purporting to be the last will and testament of Lucy B. Townsend, dated the twenty-sixth day of February, 1912; and if they find that, before the said paper-writing was executed by her, she read said paper-writing, including the said fourteenth item or clause; and if they further find that, at the time of executing said paper-writing, she was capable of understanding the business in which she was engaged, and of executing a valid deed or contract, then, the legal presumption is, that she knew and understood the contents of said paper-writing, including the said clause or item; but the jury are further instructed that this presumption is not conclusive, but may be rebutted; and if the jury find that said Lucy B. Townsend instructed Mr. George R. Willis, the draftsman of said paper-writing, that she wished the rest and residue of her estate, mentioned in the fourteenth item of said paper-writ-

ing, to go to her nieces and nephews; and if they further find that, not having any nieces and nephews, by these words she meant some other persons, and that in reading said fourteenth item, she failed to know and understand that said item did not give said rest and residue to the persons for whom she intended it; then, the jury are instructed that she did not know and understand said fourteenth item; and their answer to the fifth issue must be "Fourteenth Item," even though they may find for the defendants on the second issue, and even though they may further find that Lucy B. Townsend knew and understood the remaining contents of said paperwriting. (*Refused.*)

*Plaintiffs' 9th Prayer.*—The jury are instructed, at the request of the plaintiffs, that if they shall find from the evidence in this case that all parts of the paper-writing offered in evidence, dated the twenty-sixth day of February, in the year nineteen hundred and twelve, and purporting to be the last will and testament of Lucy B. Townsend, were read by the said Lucy B. Townsend at a time when she was possessed of sufficient capacity to execute a valid deed or contract, and that said paper-writing was then signed by the said Lucy B. Townsend in the presence of three witnesses, then the presumption of law is that the contents of said paperwriting, and all parts thereof, were known to, and understood by the said Lucy B. Townsend, and that it was not necessary that the said Lucy B. Townsend should have understood the legal operation and effect of said paper-writing or any part thereof.

But the jury are further instructed, that this presumption may be rebutted, and if the jury shall find from all the evidence in the case, that the contents of the fourteenth item or residuary clause of her alleged will were in fact unknown to the said Lucy B. Townsend when she executed said paperwriting; then the answer of the jury to the fourth issue shall be "Unknown in part," and their answer to the fifth issue shall be "Fourteenth Item." (*Refused.*)

*Plaintiffs' 10th Prayer.*—That according to the undisputed evidence in this case, Lucy B. Townsend, at the time of the execution of the paper-writing, dated the twenty-sixth day of February, 1912, and purporting to be her last will and testament, did not know and understand the contents of the fourteenth item or residuary clause of said paper-writing; and the jury must so find in answer to the fifth issue. (*Refused.*)

---

*Defendants' 1st Prayer.*—The Court instructs the jury at the request of the defendants: That there is no evidence in this case legally sufficient to show that Lucy B. Townsend, at the time of the execution of the will in controversy, was of unsound mind and incapable of executing a valid deed or an ordinary contract. And the answer of the jury to the second issue should be "Yes." (*Refused.*)

*Defendants' 2nd Prayer.*—The Court instructs the jury at the request of the defendants: That there is no evidence in this case legally sufficient to sustain a verdict for the plaintiffs on the fourth and fifth issues. And the answer of the jury to the fourth issue should be "Yes"; and the answer to the fifth issue should be "No parts." (*Refused.*)

*Defendants' 3rd Prayer.*—The Court instructs the jury at the request of the defendants:

(1) That legal capacity to make a valid will is the degree of intelligence sufficient to make a valid deed or an ordinary contract.

(2) The question whether the bodily diseases of Lucy B. Townsend and the opiates administered to her had deprived her of sufficient intelligence to make a valid will, as above defined, must be determined by the external acts and appearances and the speech and conduct of the said Lucy B. Townsend during the entire testamentary transaction.

(3) And if the jury shall find that the said Lucy B. Townsend had sufficient intelligence, as above defined, then their

answer to the second issue must be, Yes;—even although the jury shall further find that the residuary clause of the will fails to carry out her intention with regard to the residue of her estate. (*Granted.*)

*Defendants' 4th Prayer.*—The Court instructs the jury at the request of the defendants:

(1) The jury cannot infer mental incapacity merely and alone from the failure of Lucy B. Townsend, while she was reading the will in controversy, to discover that the legal effect of the language used in the residuary clause was to give the residue of her estate to persons to whom she did not intend it to go.

(2) And unless the jury shall find from the facts in this case, other than such mistake in said residuary clause, some evidence satisfying them that the said Lucy B. Townsend, at the time of the execution of said will, was of unsound mind and not capable of making a valid deed or an ordinary contract,—then the answer to the second issue should be, Yes; the answer to the fourth issue should be, Yes; and the answer to the fifth issue should be, No parts. (*Granted.*)

*Defendants' 5th Prayer.*—The Court instructs the jury at the request of the defendants:

(1) That in answering the fourth and the fifth issues, the jury must determine: Whether Lucy B. Townsend knew and understood what the contents of her will were, and not: Whether she understood the legal operation and effect of all or any part of the language used.

(2) And if the jury shall find that the said Lucy B. Townsend, at the time of the execution of the will in controversy, was possessed of sufficient intelligence to make a valid deed or an ordinary contract; and shall further find that she read aloud the whole of her will,—then knowledge and understanding of its contents must, under the facts of this case, be conclusively presumed. And the answer of the jury to the fourth issue should be, Yes; and the answer to the fifth issue should be, No parts. (*Granted.*)

*Defendants' 3rd Prayer ·(As Modified by the Court).—*
The Court instructs the jury at the request of the defendants:

(1) That legal capacity to make a valid will is the degree of intelligence sufficient to make a valid deed or an ordinary contract.

(2) The question whether the bodily diseases of Lucy B. Townsend and the opiates administered to her had deprived her of sufficient intelligence to make a valid will, as above defined, must be determined by the external acts and appearances and the speech and conduct of the said Lucy B. Townsend during the entire testamentary transaction, in connection with testimony as to her condition.

(3) And if the jury shall find that the said Lucy B. Townsend had sufficient intelligence, as above defined, then their answer to the second issue must be, Yes;—even although the jury shall further find that the residuary clause of the will fails to carry out her intention with regard to the residue of her estate. (*Granted as Modified.*)

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Robert Biggs* and *Charles F. Harley* (with whom was *C. Arthur Eby* on the brief), for the appellants.

*Joseph C. France* (with whom was *George R. Willis* on the brief), for the appellees.

BURKE, J., delivered the opinion of the Court.

On the 26th day of February, 1912, Lucy B. Townsend executed a paper writing purporting to be her last will and testament, which was admitted to probate by the Orphans' Court of Baltimore City. This paper, which we shall denominate in this opinion, her will, contained fourteen items. It appointed Samuel Clinton Townsend and William Stone

Townsend executors, and letters testamentary were issued to them.

The first eleven items of the will contained pecuniary bequests to certain named persons. By the twelfth item she bequeathed to her sister, Anna Grace Lyon, all her jewelry, clothing, furniture, pictures, books and silverware, if she should be living at the time of the testatrix's death; if, however, she should be dead at that time, the same should constitute a part of the rest and residue of the estate. By this item she also bequeathed to her said sister the rents, issues and profits on the sum of fifty thousand dollars, which she directed to be set aside for the use of her sister for life, and after her death to be and become a part of the residue of the estate. By the thirteenth item the rents and profits of a like sum were directed to be paid to her brother, John Lyttleton Lyon, for life, and at his death said sums should fall into and become a part of the residuary estate. The fourteenth item, which deals with the residuary estate, is here transcribed:

> "Item XIV. All the rest and residue of my estate, real, personal and mixed, including the respective amounts set aside for the use of my brother and sister, for life, and after their respective deaths unto such persons living at that time who would, under the laws of Maryland, inherit real estate of me had I died intestate."

A caveat to the will was filed by John L. Lyon and Anna Grace Lyon, the only surviving brother and sister of the testatrix, and thereupon the Orphans' Court of Baltimore City transmitted certain issues to the Baltimore City Court for trial. The case was tried three times. Twice the jury were unable to agree. Upon the third trial a jury in the Superior Court of Baltimore City, to which the case had been removed, rendered a verdict sustaining the will. The appeal before us is taken by the caveators from the ruling of the Court made during the progress of the trial.

The first and third issues were withdrawn by consent, and the case was tried upon the following issues:

2. Was the paper writing, dated the 26th day of February, in the year nineteen hundred and twelve, and purporting to be the last will and testament of said Lucy B. Townsend, executed by her when she was of sound and disposing mind, and capable of executing a valid deed or contract?

4. Were the contents of the paper writing, dated the 26th day of February, in the year nineteen hundred and twelve, purporting to be the last will and testament of Lucy B. Townsend, read to or by her, or known or understood by her at or before the time of the alleged execution thereof?

5. What parts, if any, of the said paper writing were unknown to, or misunderstood by, the said Lucy B. Townsend, at the time of the alleged execution thereof?

The modal execution of the will was admitted by the caveators at the trial, and the caveatees were relieved of the necessity of proving the same. At the conclusion of the whole case the defendants submitted two prayers by which the Court was asked to direct a verdict for the defendants: *First,* because there was no legally sufficient evidence in the case to show that at the time of the execution of the will the testatrix was of unsound mind and incapable of executing a valid deed or an ordinary contract; and, *secondly,* because the evidence was legally insufficient to sustain a verdict on the fourth and fifth issues. These prayers were rejected. The evidence offered by the plaintiff, if believed by the jury (and it was the sole tribunal to pass upon the weight of the evidence and the credibility of the witnesses), was legally sufficient to have carried the case to the jury upon each issue submitted.

The mental capacity required by the law for the making of a will, and the character and scope of the evidence which may be resorted to upon the issue of testamentary capacity have been the subject of many adjudications of this Court and elsewhere. The law is so definitely settled upon these subjects that a brief quotation from two cases will be suffi-

cient in the consideration of the questions raised under the second issue.

In *Davis* v. *Calvert et al.,* 5 G. & J. 269, it was said: "The written law of this State furnishes the rule, by which the capacity of a testator is to be measured; and the inquiry must always be, whether at the time of executing or acknowledging the will or testament, he was capable of executing a valid deed or contract; that is here, the standard by which the mental capacity of a testator is to be ascertained, and no inferior grade of intellect will suffice. That state of mental capacity is to be determined by the condition of the testator's mind, at the time of his executing or acknowledging the will or testament. For, notwithstanding his incapacity at a prior or subsequent time should be proved, it does not necessarily follow that he was incompetent when the will or testament was made, as his incapacity before or after that time might have been the effect of a temporary cause. But for the purpose of shedding light upon the state of his mind, at the time the will or testament was made, evidence of his condition, and of his bodily imbecility, both before and after that period may be produced. And the jury may, upon the whole evidence, infer incompetency at the time of executing or acknowledging the will or testament, according to the character and cause of the entire incapacity proved; which may be established by proof of the conversations or actions, or declarations of the testator inconsistent with sanity, or of all of them taken together. The general maxim is, *semel furibundus semper furibundus praesumitur.* It is not of itself sufficient to avoid a will or a testament, that its dispositions are imprudent, and not to be accounted for. But a will or testament may, by its provisions, furnish intrinsic evidence, involving it in suspicion, and tending to show the incapacity of the testator to make a disposition of his estate, with judgment and understanding, in reference to the amount and situation of his property, and the relative claims of the different persons who should have been the object of his

bounty—such as a disposition of his whole estate, to the exclusion of near and dear relations, having the strongest natural claim upon his affections; a wife and children for instance, or other near relations, without any apparent or known cause, which alone would be a suspicious circumstance, although not furnishing *per se* sufficient grounds for setting aside the instrument."

JUDGE SCHMUCKER, in *Davis* v. *Denny,* 94 Md. 390, said: "This Court has frequently been called upon to define the testamentary capacity which a testator is required to possess in order to make a will. Its decisions upon that subject have uniformly held, with slightly varying forms of expression, that such capacity consists in the possession by the testator at the time of making his will of a full understanding of the nature of the business in which he is engaged; a recollection of the property of which he intends to dispose and the persons to whom he means to give it; and also an understanding of the manner in which he in fact disposes of it, and of the relative claim of the different persons who are or should be the object of his bounty. *Davis* v. *Calvert,* 5 G. & J. 301; *Colvin* v. *Warford,* 20 Md. 367, 388; *Higgins* v. *Carlton,* 28 Md. 125; *McElwee* v. *Ferguson,* 43 Md. 479; *Brown* v. *Ward,* 53 Md. 382.

"Sanity and mental capacity are presumed by the law to exist in reference to making wills as well as to other transactions, and the burden of proof is upon those who alleged their non-existence. *Brown* v. *Ward, supra; Higgins* v. *Carlton, supra; Tyson* v. *Tyson,* 37 Md. 582."

A brief statement of the more important and essential parts of the evidence produced by the appellants will now be made. It is not, however, the province of this Court to determine whether the testatrix possessed the required capacity, as defined in the cases cited, to make a valid will; but whether the jury might have reasonably concluded from the evidence offered by the plaintiff that she was mentally incompetent to do so.

We state the question in this way for the reason that it was earnestly contended by the counsel for the appellees that the Court ought not to reverse the case for any errors that might be found in the exceptions, because there was no legally sufficient evidence in the case to support a finding for the plaintiffs upon any of the issues, and, therefore, whatever the error the Court may have committed in its rulings, was not *reversible error.*

The testatrix in 1889, being then Miss Lucy B. Lyon of Richmond, Virginia, and about thirty-four years of age, married Samuel Townsend of Baltimore, who was much her senior, and who died in 1904. Notwithstanding the great disparity in their ages, their married life appears to have been a happy one. Mrs. Townsend survived her husband about eight years, and died in the Hospital for Women of Maryland, in the City of Baltimore, a few days after a surgical operation had been performed upon her for appendicitis.

This operation was performed between the hours of twelve and one o'clock on February 26th, 1912. The will in controversy was executed in the anesthesia room of the hospital a short time before the operation was performed. This room adjoins the operating room, and at the time Mrs. Townsend signed the will she was sitting upon what is called a "carrier,"—a conveyance used to transport patients into the operating room. Mrs. Townsend had been taken to the hospital on the previous night, Sunday, February 25th, from the house of Mrs. Smyser. Mrs. Townsend never had any children, and at the time of her death there were no lineal descendants of her husband living. The testatrix was the third wife of Samuel Townsend. By a former marriage he had issue, and at the time of his death he left surviving him one grandchild,—the only son of a pre-deceased son. This grandson was dead at the date of the will. There were certain nephews and nieces of Samuel Townsend living in Baltimore, and the relations between them and the testatrix appear to have been of a uniformly cordial and friendly character.

She spoke of them at times as her nephews and nieces, and they addressed her as aunt.

At the time of her death, Mrs. Townsend's only surviving brother and sister were the caveators. The sister was unmarried. The brother was married, but had no issue. She had no nephews and nieces of her own blood. On her mother's side she had some first cousins and one aunt living. On her father's side there were some first, second and third cousins living in Pittsburgh, who appear to be people of wealth and social importance. There was no intimacy between them and her. They met occasionally, but did not correspond, and really knew very little about each other.

Mrs. Townsend's father died when she was a young girl, leaving a widow and five children surviving: George, John, Lucy B. (Mrs. Townsend), Grace and Harry. They appear to have been in poor financial circumstances, and the burden of supporting the family devolved upon John and George. These two brothers supported Mrs. Townsend up to the time of her marriage, and the relations between her and them were close and affectionate.

Mrs. Dickinson, the aunt of Mrs. Townsend, testified that Mrs. Townsend was very fond of her brother John; that she admired him and he used to write her the most beautiful letters; that she thought him a man with a high sense of honor; a man of great capacity, and a man that anyone could love and depend on, and that he was a good, consistent Christian; that John commenced to participate in the care of the family upon the death of his father, which occurred when he was but eleven years of age; that he left home and went to Pittsburgh where he was successful and continued to assist in the support of the family.

Mrs. Townsend, at the time of her marriage was described as 'a very intelligent woman, a very sensible woman, a woman that was not easily influenced; she was well sustained and a person who had a great deal of executive ability, and was competent to do anything that was to be done." She lived at

home until her marriage. She was the eldest daughter, and took charge of the house when her mother was in bad health. Shortly after the death of her husband in 1904, it is shown by the evidence of the caveators that her health began to fail, and that after the death of her brother Harry, who died in 1909, she "began to go back very materially, both mentally and physically." Her brother George died in 1911. She was very much attached to her brothers, and their deaths were a great shock to her. The death of her brother Harry appears to have greatly affected her nervous system. She developed serious Bright's disease. We quote from the testimony of Mrs. Dickinson, as it appears in the record: "Mrs. Townsend was greatly disappointed by Harry's death; she bought a place thinking she would have her brother to live there with her, but as he died she felt that she had no one and she would have to go through life alone, and witness thought it affected her health very materially, both physically and mentally, *because she never got any better but grew worse and worse every year.* Witness also said she was very capricious at times, but witness thought she was perfectly able and competent to attend to her affairs, for she never called upon any one to assist her in that; that she was always anticipating evil; that she thought something dreadful was going to happen every day and that seemed to be on her mind all the time. She could not sleep at nights; she said if she opened her eyes at night she would always see her deceased brother sitting there in the corner looking at her. She said she could not sleep; that rats were running over her all night and that spooks were walking around her bed; she seemed to have hallucinations to a great degree. Witness drove with her every day, and she would go to sleep just as soon as they entered the surrey and sleep all the time until they got home; it was impossible to keep her awake."

Claude M. Dean, testifying to a conversation he had with Mrs. Townsend in June, 1911, immediately following the death of her brother George, said that during the talk: "She

fell off in a kind of a stupor, or kind of semi-consciousness, and remained that way possibly a second or two, and that other times possibly a minute or two, while as she came too she started to tell the same thing over again, and when she started to tell it the third time I began to take notice and I found that when she got through she told the same thing over six different times * * * she repeated herself so often, over and over again, during the conversation; she would kind of fall off in a sleep, stupor, or appearing to be asleep for a second or two, sometimes lasting longer, possibly a minute or two."

Mrs. Mary B. Todd, testified that she visited Mrs. Townsend in August, 1911, and went driving with her frequently; that "Mrs. Towsend would nearly always drop off asleep during the drive; she seemed very drowsy and slow and not very active; she was always willing and anxious to go, but seemed to go beyond her strength always; witness noticed how slowly she came and went up and down the steps of her house. She asked witness to look at her limbs and she saw great big purple spots on them. During this same visit witness observed that she would constantly repeat herself; she seemed to forget that she had told things and would tell them over." Mrs. Todd saw Mrs. Townsend in October, 1911. She testified that at that time Mrs. Townsend looked so wretched that she would not have been surprised at her death, and was thoroughly alarmed at her condition. She saw her again in November, 1911, and said that "she seemed to witness to be gradually growing worse each time witness saw her, and she seemed less alert, less cheerful, less mentally active, or physically and mentally."

Mrs. Sarah J. Lyon, the wife of John L. Lyon, one of the caveators, testified that in October, 1911, Mrs. Townsend visited her at her home in New York City. She said that Mrs. Townsend looked so bad that witness would not have been surprised if she had died any minute. She was all swollen under the eyes and she did not seem to realize what she was doing half the time. She went with witness to the

theatre four times inside of forty-eight hours, and during the intermissions she would sleep, sleep all the time. Then she would wake up and hold the program and seemed to know what was going on at that time; the next day she would say to witness, 'Why Jane, what was all that about last night, I don't remember a thing about it.' Witness would say so and so, and she would say she did not know it."

In February, 1912, Mrs. Townsend was in Baltimore stopping at the home of Mrs. Smyser. She was taken ill there. and Doctor Robert T. Wilson, a physician and surgeon who had previously been her attending physician, was called to see her. He considered her a very sick woman, and tried to induce her to go to the hospital, but she would not consent to do so. On Sunday night, February 25th, 1912, she informed Doctor Wilson that on the preceding Thursday she had fallen in the bath room. He was of the opinion that the fall had ruptured the appendix sac and that she had peritonitis. He told her she must go to the hospital. We quote from his testimony as it appears in the record: "She did not want to go, and it made her very excited; she did not want to go but witness talked to her about her ill condition and told her she must go. She then made up her mind to go. The approaching operation made her more apprehensive. On the 26th she was just as ill as the night before. She was so ill that witness considered an operation should be done just the first moment possible. Witness considered her then to be in a dying condition, and it was urgent an operation should be done to give her the only chance that might be any chance for her."

Doctor Robert W. B. Mayo, the chief resident surgeon of the Woman's Hospital, testified that when he saw Mrs. Townsend on Sunday night she was an extremely ill woman. She was quite restless and anxious and apprehensive because of being brought to the hospital and because of the pending operation; that the next morning she was just the reverse of the night before. "She was depressed and sleepy. Of course

when spoken to she would awaken and answer a few words and lapse into a period of sleepiness again, what we call a semi-comatose condition." He further said: "The operation was performed upon the abodmen and a cut or incision was made through the abdominal wall down to this lining I mentioned, the peritoneum, and as soon as that was nicked with the knife, the puss gushed out to a height of six or eight inches, so much was in there, and it was under pressure and it gushed out with the nick in the lining, the membrane." The operation was not completed because of Mrs. Townsend's serious condition, but drains were inserted to relieve her of the puss. She had uraemia and septicaemia,—both blood poisoning,—the first caused by diseased kidneys and the second by the puss in the abdomen. The immediate cause of her death was uraemic poisoning, hastened by the septicaemia and the shock of the operation.

It was admitted that a dose of one-fourth of a grain of codeine was administered to Mrs. Townsend at about ten-thirty P. M., Sunday, February 25th, 1912, and another dose of one-fourth of a grain of codeine was administered to her about nine-fifteen A. M. on Monday, February 26th, 1912, and a dose of one-eighth of a grain of morphine and one-150th grain of atropin was administered to her hypodermically about twelve o'clock noon on Monday, February 26th, 1912.

We now state what we understand to be the substance and effect of the evidence produced by the plaintiffs as to the circumstances attending the preparation and execution of the will:

Twelve o'clock was the time fixed for the operation. On the morning of February 26th, 1912, Mr. George R. Willis received a call over the telephone from William S. Townsend telling him that Mrs. Townsend was about to be operated upon, and that she wished to make some changes in her will. The will referred to was one which had been prepared in December, 1909, after the death of Harry Lyon. It was in

the possession of Mr. Willis. The pecuniary bequests in this will, with three exceptions, were identical with those contained in the will in controversy. By the will of 1909 the whole residuary estate was given equally to George, John and Anne Grace Lyon, with a limitation over to the survivors in the event of the death of either.

Mr. Willis went at once to the hospital, and saw Mrs. Townsend in her room, and was with her not longer than fifteen minutes,—possibly not that long. He went from the hospital to his office and hurriedly prepared the will which was taken by Mr. Luther M. R. Willis to the hospital for execution. Mr. George R. Willis testified that Mrs. Townsend told him she wanted the residuum of her estate left to *her nieces and nephews.* Testifying as to his visit to the hospital, his conversation with Mrs. Townsend, and the preparation of the will, Mr. Willis said: "I remember I was very busy that morning and received a telephone message from the hospital, sent by Mr. William S. Townsend, that Mrs. Townsend wanted to see me, and that she was going to be operated on that morning by Doctor Finney, and that I should hurry; I got up there as fast as I could; I dropped everything I was doing and went up; I was shown into her room by Doctor Wilson; there was a nurse in her room, but they all went out, and Mrs. Townsend and myself were alone in that room; she was lying in bed and told me that they were going to operate on her; they thought it best; I asked her who advised it, and she said Doctor Finney; I told her that she ought to be entirely satisfied; she then said that she wanted to make an alteration in her will; my recollection is she asked me where the will was, and I told her it was in my strong box; she said Maria is dead—that was Mr. Townsend's grandson's widow—I want to eliminate, I want to take out the legacy I had given her, and I want to give a legacy to a little girl, whose name I had not heard before; I took the name down to give her a legacy—

"Q. What name was that? A. Bloom, I think the name of Juanita Bloom. Q. Did you know how to spell Juanita? A. No; I asked her how to spell it and she spelled it for me, and I wrote it down and then she said she did not want Grace to have but the income on $50,000; and she did not want her brother John to have any more than the income on $50,000; she said that was enough for them. I took that down; I asked her, Where do you want the rest to go? She said, *I want it to go to my nieces and nephews,*—is that all you want?—she said, yes.

"I took Mr. Townsend's automobile at the hospital and hurried back to my office and got out the old will and had the first page of it copied, because the legacies in the new one were the same as in the old one with the exception of eliminating one and increasing another and adding another; then I dictated as rapidly as I could in a way I would not have dictated it had I had the time, but making it clear and certain that $50,000 out of her fortune was set aside for her brother and sister respectively, and using language such as I have used in wills which would, in my judgment, carry it over to her nieces and nephews had she any; I did not know that she had no nieces and nephews, but the language that I employed in the will would have taken it, in my opinion, to her nieces and nephews had she had nieces and nephews."

When Mr. Luther Willis visited the hospital he found Mrs. Townsend in the anesthesia room resting upon the carrier referred to. The dose of morphia and atropin, above mentioned, had been administered to her hypodermically after Mr. George R. Willis had left the hospital. Doctor Wilson, Miss Keen, a nurse, and Doctor Buckler were in the room when Mr Willis entered. He handed Mrs. Townsend the will, and asked if she could read it, or whether she wanted him to read it. She said she could read it. She sat upon the carrier, asked for her glasses and some water, and began to read the will aloud. When she came to the bequest to Mrs. Smyser she stopped, saying: "I thought I told your father,

I intended to tell him, to raise that the same as Edith's."
She said, "You know Mrs. Smyser is Edith's and Clint's
sister and I wanted her to have the same as Edith has." That
Doctor Wilson spoke up and said "We can change that and
we will witness it." The witness, at her direction, took a
pen and struck out the $500 and made it $1000."

After this correction had been made, she continued reading
the will, and when she reached the residuary clauses, or as
Mr. Luther Willis stated, he *"supposes half way down the
residuary clause"* an incident happened which plays a most
important part in this case. Doctor Wilson, after testifying
to the increase made in the bequest of Mrs. Smyser, testified
as follows:

"Q. Then what happened? A. Then she started to read
again, and in a little while she came to a stop. Q. What
part of the will was that? A. Around the rest and residue;
around that portion. Q. Around the rest and residue? A.
She stopped. Q. Is that the fourteenth item, the rest and
residue? A. It was about there. Q. What happened there?
A. It was very quickly after her reading the other; *she came
very quickly to this part.* Q. She came quickly down to the
rest and residue? A. Yes. Q. When she got to the rest and
residue what happened? A. Just at that time she stopped
and her eyes closed and she went backwards into a semi-
conscious condition; it did not last long, but the nurse was
behind her. Q. What nurse was that? A. Miss Keen. She
was behind her; so she supported her; as I say, she came for-
ward and started to read again. Q. How did she read? A.
*In a mechanical way.* Q. Go ahead! A. She kept on read-
ing; her voice, I think, *got slower.* Q. What? A. I think
her voice got slower, and she finished reading, and then she
signed her name. Q. Was anything said by Mrs. Townsend
about the number of witnesses? A. She said in Virginia she
thought it required three witnesses. Q. When was it she
said that? A. When she got to the end; when she had fin-
ished reading it."

Miss Keen, a trained nurse, said that Mrs. Townsend towards the last fell back as if under the influence of morphia. "Well, she simply just fell just in that way (illustrating) and I caught her. You see I had my arms around her and lifted her up again and she went on and finished reading the will. . It indicated to me that she was going under the influence of morphia."

Doctor Wilson and Miss Keen were subscribing witnesses to the will, and each testified that Mrs. Townsend at the time of its execution was not competent to make a will, and both were of opinion that the anodynes which had been administered had caused the incident mentioned. The residuary clause was not explained to her. It is admitted that a grave mistake was made, and it is evident that the persons who would take the larger portion of the estate under that clause are not the ones she intended to have it. If that clause be sustained the real will and intention of Mrs. Townsend would be thwarted.

To what extent, if any, the mental faculties of Mrs. Townsend were affected by the administration of the drugs mentioned was one of the most material inquiries in the case, and we do not see why the offers of proof embraced in the first second and third exceptions were excluded. The witness, Doctor Mayo, was qualified to testify, and the testimony sought to be elicited bore upon the issue of mental capacity, and tended to support the evidence of Doctor Wilson and Miss Keen as to the cause of the incident which occurred during the execution of the will. While we would not reverse upon the first exception, because the evidence objected to was in substance introduced afterwards, we think there was serious error in the rulings on the second and third exceptions.

For the determination of the legal questions which arise upon the ruling upon the prayers, we are not required to review the evidence produced by the appellee. Suffice it to say that upon the material questions involved—mental capac-

ity and the circumstances attending the execution of the will—there is great conflict, but with that we have nothing to do. It is not the office of this Court to weigh or balance conflicting evidence. That is exclusively the duty of the jury.

We come now to the consideration of the rulings of the Court on the prayers submitted by each party at the close of the whole case. The plaintiffs offered ten prayers. The second, fourth and fifth were granted, and the others refused. The plaintiffs' first and third prayers, which the reporter is requested to set out in the report of the case, were upon the subject of testatmentary capacity. They announce correct principles of law, lay down the proper rules for the guidance of the jury in considering the second issue, and should have been granted. The sixth prayer related to knowledge by the testatrix of the contents of the *whole will,* and the seventh, eighth, ninth and tenth to knowledge of the contents of the fourteenth, or residuary clause of the will.

Assuming for the moment that the question of the knowledge of the contents of the whole will, or of the residuary clause was open, under the facts, for the finding of the jury, the sixth, seventh and eighth prayers were defective, under the facts and circumstances of this case, in shifting the burden of proof to the defendant. The presumption of knowledge of the contents of a will which arises from due execution and the reading of a will by a competent testator is not overcome by the mere fact that this presumption may be rebutted. In the form in which the issue was submitted, the answer of the jury, in case they found for the plaintiffs on the fourth issue, should have been: "Were not known and understood." The eighth prayer required the jury to find whether the testatrix "failed to know and understand that said item did not give said rest and residue to the persons for whom she intended it." This was tantamount to requiring the jury to find whether she knew the legal effect and operation of the words used in the fourteenth clause, and in this respect the prayer was also defective. It was said in *Munnikuysen* v.

*Magraw,* 35 Md. 280, that: "If she knew and understood
what the actual contents of the will were, that would be suffi-
cient, although in point of fact she may have had some erro-
neous opinions with regard to their legal effect and operation.
Sane persons when they express themselves in writing are
presumed to mean what the writing imports, and it would
be dangerous and in plain violation of the Statute of Frauds
to allow it to be impeached or overthrown by evidence
*aliunde,* showing that they meant something else, or did not
understand its true import and operation."

The ninth and tenth prayers, upon the assumption pre-
viously made, were free from objection.

The defendants' third prayer, as modified by the Court,
was granted, and their fourth and fifth prayers were also
granted. These prayers are here inserted:

*Third Prayer.*—The Court instructs the jury at the re-
quest of the defendants:

(1) That legal capacity to make a valid will is the degree
of intelligence sufficient to make a valid deed or an ordinary
contract.

(2) The question whether the bodily diseases of Lucy B.
Townsend and the opiates administered to her had deprived
her of sufficient intelligence to make a valid will, as above
defined, must be determined by the external acts and appear-
ances and the speech and conduct of the said Lucy B. Town-
send during the entire testamentary transaction, in connec-
tion with testimony as to her condition.

(3) And if the jury shall find that the said Lucy B.
Townsend had sufficient intelligence, as above defined, then
their answer to the second issue must be, Yes;—even although
the jury shall further find that the residuary clause of the
will fails to carry out her intention with regard to the residue
of her estate."

*Fourth Prayer.*—"The Court instructs the jury at the re-
quest of the defendants:

(1) The jury cannot infer mental incapacity merely and alone from the failure of Lucy B. Townsend, while she was reading the will in controversy, to discover that the legal effect of the language used in the residuary clause was to give the residue of her estate to persons to whom she did not intend it to go.

(2) And unless the jury shall find from the facts in this case, other than such mistake in said residuary clause, some evidence satisfying them that the said Lucy B. Townsend, at the time of the execution of said will, was of unsound mind and not capable of making a valid deed or an ordinary contract,—then the answer to the second issue should be, Yes; the answer to the fourth issue should be, Yes; and the answer to the fifth issue should be, No parts."

*Fifth Prayer.*—"The Court instructs the jury at the request of the defendants:

(1) That in answering the fourth and fifth issues, the jury must determine: Whether Lucy B. Townsend knew and understood what the contents of her will were, and not: Whether she understood the legal operation and effect of all or any part of the language used.

(2) And if the jury shall find that the said Lucy B. Townsend at the time of the execution of the will in controversy, was possessed of sufficient intelligence to make a valid deed or an ordinary contract; and shall further find that she read aloud the whole of her will,—then knowledge and understanding of its contents must, under the facts of this case, be conclusively presumed. And the answer of the jury to the fourth issue should be, Yes; and the answer to the fifth issue should be, No parts."

The third prayer gave the jury no satisfactory rule by which to measure the testatrix's testamentary capacity,—to guide them in determining from all the facts and circumstances of the case whether she had sufficient capacity to make the will. To say "that legal capacity to make a valid will is the degree of intelligence sufficient to make a valid deed or an ordinary contract" is to announce a general legal proposi-

tion; but such a statement does not furnish the jury any
sufficient guide in their deliberations, and, as the prayers of
the plaintiffs which defined the meaning ·of testamentary
capacity were refused, the case went to the jury without any
plain and definite instruction upon that question.    The sec-
ond clause of the prayer shuts out from the consideration of
the jury the provisions of the will, especially the fourteenth
clause, and places restrictions upon the jury which were well
calculated to fetter them unduly in their deliberations and to
mislead them as to the scope of their inquiries.    The correct-
ness of the third clause of the prayer will be considered later.

The conflicting contentions of the parties—presenting the
most material and important legal question in the case—are
manifest upon the prayers which relate to the knowledge of
the contents of the will.

The position of the plaintiffs is that, notwithstanding the
fact that Mrs. Townsend was competent to make the will and
that she did in fact read it before she signed it, they have a
right, under the facts and circumstances in evidence, to have
the jury pass upon her knowledge of the contents of the
whole will and of the fourteenth clause as distinct and inde-
pendent issues of fact.

The position of the defendants is, that assuming the capac-
ity of the testatrix and that she read the will, the presump-
tion of knowledge of contents, under the facts of this case, is
conclusive.    This proposition is embodied in the defendants'
fourth and fifth granted prayers.

There is in this State no invariable and unyielding rule
of law upon this subject.    The general rule undoubtedly is
that knowledge of contents is conclusively presumed in the
circumstances stated in the defendants' fourth and fifth pray-
ers.   That rule was applied in *Taylor* v. *Creswell,* 45 Md.
422, and in *Diffenderffer* v. *Griffith,* 50 Md. 466.    These
cases rest upon the principles announced in *Guardhouse and
others* v. *Blackburn,* L. R. 1 P. & D. 109 and *Atter* v. *Atkin-
son and another,* L. R. 1 P. & D. 665, and other English
cases.   In *Taylor* v. *Creswell, supra,* it was shown that the

will was drawn by the attorney for the testatrix *according to her directions,* and was then read over to her, and she said that she understood it and was satisfied with its provisions. The Court said that: *"Under such circumstances,* the jury was bound by the presumption of law in favor of knowledge of the contents of the will on her part." The Court then quoted in support of its judgment the general rule announced in *Atter* v. *Atkinson, supra.*

In *Diffenderffer* v. *Griffith, supra,* the will and codicil assailed were read to the testatrix "line by line, just as they were written" and she being in full possession of all her faculties, the Court found that there was nothing to except the case from the operation of the *general rule.* But this rule is not of universal application, and cases may occur where the rule ought not to be applied.

In *Taylor's case, supra,* the Court said that: "It is essential of course to the validity of every will, that the party making it should know and understand its contents, otherwise it is not his will. But where a person of *sound* mind executes a will, and the same is his *free and voluntary* act, the law presumes knowledge, on his part, of its contents. This presumption, it is true, may be rebutted by the facts and circumstances surrounding its execution, and cases may arise in which it is proper to submit to the jury the distinct question, whether the testator understood its contents. Where, for instance, there are suspicious circumstances surrounding the execution of a will, made by a person suffering from extreme debility arising from old age or sickness, especially if he could neither read nor write; or where the will is prepared by a person standing in a confidential relation, or who is largely benefited by it, or even where the testator is of sound mind, if there is proof to show that he did not understand its contents, an extreme case, however, in these and other like instances, it may be proper for the jury to find affirmatively, that the testator understood the contents of the will."

The case we are dealing with is a most unusual and exceptional one.   The will does not express the real intention of the testatrix, and under the fourteenth item the greater part of her estate goes to persons who have no claim upon her bounty and to whom she never intended to give it.   Assuming the testimony of the plaintiffs as to the circumstances attending the execution of the will to be true, the case in our judgment falls clearly within the exception to the general rule. It would be strange, indeed, if the *mere* fact of reading the will, under such circumstances, should be held conclusive of her knowledge of its contents.   The fourteenth item of the will was open to attack under the fourth issue.   *Munnikuysen* v. *Magraw, supra; Fisher* v. *Boyce,* 81 Md. 46.   Without further prolonging this opinion our conclusion is that the trial Court committed reversible error in its rulings embodied in the second and third exceptions; in refusing the plaintiffs' first, third, ninth and tenth prayers, and in granting the defendants' third prayer as modified. and in granting the defendants' fourth and fifth prayers.   The rulings, therefore, must be reversed and the case remanded for a new trial.

*Rulings reversed, and a new trial awarded.*